Marion KLAESENER and Bernard Klaesener, her husband, Appellants,

v.

SCHNUCKS MARKETS, INC., Respondent.

No. 55734.

Supreme Court of Missouri, Division No. 2.

July 16, 1973.

Mogab, Hughes & Green, Richard L. Hughes, St. Louis, for plaintiffs-appellants.

Evans & Dixon, Eugene K. Buckley, St. Louis, for respondent.

HOUSER, Commissioner.

Action by Marion Klaesener (hereinafter "plaintiff") for personal injuries and by her husband Bernard for loss of services and expenses incurred as a result of a fall sustained by Mrs. Klaesener when she entered Schnucks Market in Ferguson as a customer. The trial jury returned a verdict for defendant and plaintiffs appealed (prior to January 1, 1972). We have jurisdiction because the amount in controversy exceeds $30,000.

Plaintiff fell on January 8, 1968 on a busy Saturday afternoon about 2 p. m. It had been snowing for hours. All around the entry way it was wet, sloppy and slushy, with black slush and black water spread out on the floor "like the water that comes off when you stomp your feet and knock the snow off." Plaintiff had entered the store through a pneumatic door which opened automatically when she stepped upon a rubber treatle outside the door and closed when she stepped on a rubber treadle inside the door. She claimed that there were two rugs lying on the terrazzo floor just beyond the inside rubber treadle. Two store employees could definitely remember only one rug. Plaintiff described the first rug as a bristly, brushy-type rug and the second as a throw rug. Store employees testified there was only one type rug used in the store. Plaintiff testified that the two rugs were lying next to each other, with no terrazzo floor showing between them. The rugs were soaking wet. The floor was "very wet" in the area around the rugs. Plaintiff said the second rug was lying flat on the floor and seemed to be in good order; was not crumpled, bunched up or turned up on one end. She wiped her feet on the first rug, she said, then stepped directly from the first rug to the second rug, with both feet. When she did so she said she felt the rug "go" and when it "went" both her feet slipped and the rug slipped and she "flew through the air—sailed right with the rug —and it was a sensation like a roller coaster." The next thing she knew she was on the floor, having landed on her left shoulder with her left leg curled or bent up into her body and her right leg extended straight out. She testified that on other occasions when she had been in the store while it was raining and the floor was wet the floor had been slick or slippery as she walked across it. Mr. Mazola, store manager, described the wetness of the floor as not meaning there was a quarter of an inch of water on it; it was "just wet." The area around the rug and the floor was mopped on an average of every 20 minutes that day, and the floor had been mopped between 5 and approximately 15 minutes before plaintiff fell, according to the store manager. He said that water could be wrung out of the mop after using it; that over a wide area "quite a bit of slush" could be "picked up."

The rugs used at Schnucks Market, including the rug on which plaintiff fell, were rented from and supplied by a laundering service, Dustex Service, Inc. Dustex represented to prospective customers

the nonskid characteristics of its rugs. The particular rug upon which plaintiff fell was not available at trial, it having been collected and returned to Dustex after this occurrence. Instead, Schnucks Market produced Exhibit 1, a Dustex rug, identified by the store manager and by the sales manager of Dustex as the same type of Dustex floor mat or rug supplied to Schnucks Market during the month of January, 1968, and identified by the store manager as the same type of rug which was on the floor at the time plaintiff fell.

The bone of contention on this appeal is the testimony of expert witness P. D. Trowbridge relating to Exhibit 1 and experiments he conducted testing its nonskid qualities.

Mr. Trowbridge testified as follows: He inspected Exhibit 1 and performed tests with it on the floor of the market where plaintiff fell. The underneath side of the rug has a rubber-type coating which is normally considered a gripping or nonskid type of material. That surface is textured, and when pressed has a tendency to adhere more closely to the surface on which it is put, with the exception of an oily surface. He caused the surface of the floor to be completely or almost completely covered with clear water, wetting an area some 8 by 10 feet in size with a fourth of a bucketful. Then he made a check to see if the rug would slip sideways, by stepping upon it after spreading it, rubberized surface down, and by trying to move or push it along the floor. It remained tight to the floor and would not move with pressure applied on the top of the rug. He then poured more water on the rug, this time on the top side, until the rug was completely saturated with water—until water "oozed" out when the rug was stepped on. Again he tried to move the rug, but it adhered very closely to the floor. He was unable to scoot it at all. "It wouldn't even move," whether he put his foot on it lightly, or applied his full weight of 170 pounds with both feet. He walked back and forth sideways and longwise on the rug and tried standing on the side and pushing it on the floor with both light and heavy pressure, but it would not move. In answer to a hypothetical question he gave his opinion that with one foot it is inconceivable that the rug would move; with both feet on the rug (as plaintiff testified she had stepped onto the rug) it is "practically impossible" for the rug to move. He admitted that oil accumulates on store parking lots and that if oil and water were present the adhesive quality of the rug would be impaired but considered that it would be in an amount insufficient to affect the test appreciably. He also agreed that age would cause deterioration of the rubber material on the rug and loss of some of its adhering quality but he could not estimate how long it would take to wear out without considerable further testing.

Both sides agree that the law with respect to the admissibility of evidence of experiments, as declared in Faught v. Washam, 329 S.W.2d 588, 598 (Mo. 1959), quoted in Wilcox v. St. Louis-Southwestern R. Co., 418 S.W.2d 15, 19 (Mo. 1967), is that "experimental evidence is admissible, in the sound judicial discretion of the trial court, when it is shown that the experiment was conducted under conditions substantially similar in essential particulars to the conditions prevailing at the time of the occurrence in suit. However it is not required that the conditions surrounding the experiment should have been precisely identical with those surrounding the occurrence under investigation; and, if the conditions were substantially similar, the differences in condition are for the jury in evaluating the weight to be given such evidence." It may be added that the discretion of the trial court should not be interfered with on appeal unless it is manifest that it has been abused. Lynch v. Missouri-Kansas-Texas R. Co., 333 Mo. 89, 61 S.W.2d 918, 921 (1933); Lynch v. Railway Mail Association, 375 S.W.2d 216, 220 (Mo. App. 1964).

Appellants assert error in allowing Mr. Trowbridge to testify as to the results of his experiments with Exhibit 1 because "the test was not 'substantially similar' in that (a) the age, service history and wear condition of the rug on which plaintiff fell were not shown; (b) the service history and wear condition of 'Exhibit 1' were not known, and (c) the condition of the experimental floor was so dissimilar from that which existed at the time plaintiff fell as to make the result of the experiment totally irrelevant and its admission inflammatory and prejudicial."

(a) As to the rug on which plaintiff fell: While there was no direct evidence as to its age there was evidence from which the jury could infer that its age was no more than 18 months. This follows from the testimony that rugs of the same type as Exhibit 1 were supplied to Schnucks Market in January, 1968 and were on the floor when plaintiff fell and that this type of rug was introduced to the trade in the middle of 1966. There was no evidence as to its service history and wear condition but there was evidence that Dustex rugs are withdrawn from service after 36 months because they lose their weight from constant washing and tumbling and become worn and flimsy and lose their adhesive quality. A jury could infer from this evidence that an 18-month-old rug was half worn out but had a useful life of 18 additional months. Plaintiff testified that it seemed to be "in good order"; that it lay flat on the floor and was not crumpled, bunched or turned up on one end. There was testimony that all rugs delivered by Dustex were of the same kind and same quality, and were always sealed in cellophane bags; that in all the years they were supplied by Dustex and applied to the floor they were always in good condition; that Dustex never sent out a bad rug that had to be sent back as unuseable. In his years as store manager Mazola never had any problems or complaints that these rugs had slipped on the floor, either when wet or dry. In his experience the rugs adhered flat and stuck to the floor. He had never seen a rug slide on the floor.

(b) As to Exhibit 1: While its service history and wear condition were not shown by direct evidence it appears in evidence from markings on the rug that it was acquired by Dustex in December, 1967, and therefore it reasonably could be found to be 25 or 26 months old when the expert inspected and tested Exhibit 1 the day before trial. The expert carefully described its characteristics. Although the evidence indicated that it was 7 or 8 months older than the rug on which plaintiff fell it is obvious from the expert's testimony as to its adhesive qualities and characteristics that it was in good and serviceable condition and that it properly performed its intended nonskid purposes under substantially similar conditions. From the age differential the jury reasonably could find that the rug on which plaintiff fell was in as good as or better condition than Exhibit 1, and that its service history and wear condition did not inhibit its ability to resist slippage.

(c) As to the condition of the experimental floor: The floor used in the experiments was the same terrazzo floor in the same market. There was evidence that there had been no change in the terrazzo floor between January, 1968 and the day of trial. While the conditions of wetness of floor were not identical (the water on the floor in 1968 was black and had been tracked in by customers whereas the water used in the tests was clear) the conditions were sufficiently similar to meet the requirements of admissibility. The conditions of wetness of the two rugs were so nearly the same that we perceive no substantial difference. On each occasion the rug was thoroughly saturated with water.

We conclude from all the evidence that the expert's experimental tests were conducted under circumstances substantially similar in essential particulars to the conditions prevailing at the time plaintiff fell; that the court did not abuse its discretion

and did not err in admitting the testimony of the expert as to the results of his experiments with Exhibit 1.

Appellants' second point is that the court unfairly restricted cross-examination of the expert witness by refusing to allow the assumption that the mat "did slip when plaintiff stepped on it, causing her to fall." It is argued that this was plaintiff's testimony and was a proper assumption which should have been allowed as part of the question propounded to Mr. Trowbridge, "a hostile expert witness," in order to impeach his conclusion on direct examination that a mat like Exhibit 1 "could not slip" under the conditions existing at the time plaintiff fell. This exchange occurred during the cross-examination of Mr. Trowbridge:

"Q. [Mr. Hughes]: Now, let me ask you to assume sir, that a lady stepped on a mat as she came in the store, the mat was in water, the water was generally puddled around the mat and the mat in fact slipped under her, causing her and the mat to fly some distance and to fall. Would you tell me, sir, what your conclusion would be with reference to the quality of that mat as to its adhesive quality, assuming those facts are true, that the mat did in fact fly?

"MR. BUCKLEY: I will object to that. It doesn't take into consideration anything about the mat that he is talking about, the hypothetical mat hasn't been described.

"THE COURT: I will sustain the objection. I think you have to give this expert something more, Mr. Hughes, to answer the question."

The objection made by respondent was that the hypothetical question contained no description of the mat assumed by the questioner and the court sustained the objection on that ground, namely, that it was necessary to more fully describe the mat which was the subject of the inquiry. There was no effort made to limit the question to the mat on which plaintiff fell, or any other particular mat. It was a general question posing a hypothetical lady stepping upon a hypothetical mat without giving any description of the mat, its makeup and composition, size, weight or condition; whether it had a nonskid backing or any backing at all; whether it was a Dustex mat, etc. Without such information no expert witness could give any meaningful opinion. The question was objectionable because too broad. It required some limitation. See Cole v. Uhlmann Grain Co., 340 Mo. 277, 100 S.W.2d 311, 321 [10] (1936). A hypothetical question which does not embody substantially all of the material facts relating to the subject on which the judgment of the witness is sought, Seelig v. Missouri, K. & T. Ry. Co., 287 Mo. 343, 230 S.W. 94, 102 [7] (1921), or which omits necessary elements, Powell v. Union Pac. R. Co., 255 Mo. 420, 164 S.W. 628, 636 [8] (1914), is properly excluded. "Questions to an expert witness must, of course, include all essential facts, and a question is improper if it fails to give the factual basis for the opinion asked for." 32 C.J.S. Evidence § 550, p. 514. The court in its ruling practically invited counsel to clarify the "mat" by description, but counsel declined the implied invitation, contenting himself with the observation, "Unfortunately that's all I have." The court did not err in its ruling.

Judgment affirmed.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

HENLEY, P. J., DONNELLY, C. J., MORGAN, J., and SCHOENLAUB, Special Judge, concur.

FINCH, J., not a member of Division when cause was submitted.