Filed 4/17/14  P. v. Whatley CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>NATHANIEL ANDERSON WHATLEY, JR.,<br><br>    Defendant and Appellant. | G049642<br><br>(Super. Ct. No. SWF10000264)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Albert J. Wojcik, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Nathaniel Anderson Whatley, Jr., of willfully injuring his child (Pen. Code, § 273a, subd. (a); unless otherwise indicated, all further statutory references are to this code) and found he personally inflicted great bodily injury on a child under age five (§ 12022.7, subd. (d)). The court sentenced him to 12 years in state prison.

Defendant contends the court erred in excluding an expert witness who would have testified on false confessions. He also contends the court erred in permitting admission of evidence his obstetrician-gynecology expert had previously been censured for giving false testimony. Finally, he argues cumulative error requires reversal. We disagree and affirm the judgment.

FACTS

Defendant is the father of Jane Doe, born in 2009. Defendant watched Doe during the day while the mother worked as a casino credit manager. When Doe was approximately five months old, she became ill, vomited, and developed a fever. A few days later, after performing a CT scan, emergency room physicians determined Doe had suffered three skull fractures. The CT scan disclosed collections of blood and fluid on Doe's brain. Later examinations also disclosed numerous retinal hemorrhages. Such hemorrhages are highly indicative of abusive head trauma.

Officer Fred Collazo interviewed defendant. At the outset, Collazo stated defendant was not under arrest and asked defendant "[a]re you okay to talk with me? Is it alright if I ask you some questions?" Defendant responded, "always been an open book. Right now, I mean I'm, I gotta be honest with you." Early during the lengthy interview, he acknowledged striking the baby with his palm and his knuckles.

2

Later, he stated he hit Doe four or five times. He explained: "I couldn't stop her from crying. I don't know if she was sick. I didn't know, I didn't know what to do." He subsequently said this happened while he was on a conference telephone call "to really secure a booking, that could've really helped us out financially. It would've took care of everything. That was the big one and I lost the phone call because of the noise in the background." He described the lost booking as important because he had lost four contracts that year and was facing eviction. Losing the potential booking because of Doe's crying, "was the worst shit in the world for me, I mean honestly, I was so, I've never, never been that pissed off before. The last time I was ever that pissed off was probably in the Navy."

During the trial, defendant called two expert witnesses, Dr. Ronald Gabriel, a pediatric neurologist and Dr. Barry Schifrin, an obstetrician-gynecologist. Dr.Gabriel testified Doe had an abnormally enlarged head and suffered from pressure on the brain because of fluid collection. He opined the skull fractures were the result of the use of a vacuum extractor during delivery. Dr.Schifrin opined that "the original injury stems from" the delivery activities.


DISCUSSION


*1. Exclusion of the False Confession Expert Witness*

Before trial, defense counsel expressed his intention to call Dr. Richard Leo, a social psychologist to express opinions regarding defendant's interrogation. Counsel claimed Dr. Leo would testify the method of interrogation used "increased the risk of eliciting a false statement, admission and/or confession from [defendant] . . . ." The prosecution filed a motion to exclude Dr. Leo's testimony.

3

Supplemental briefing was filed by both sides. The prosecutor referred to academic literature critical of Dr. Leo's methodology and demonstrated that Dr. Leo himself in characterizing victims of false confessions and the circumstances under which they were obtained, used criteria that did not apply to defendant. Defendant's brief noted awards received by Dr. Leo for a recent book and his extensive curriculum vitae. He noted the questioning took place after defendant's other child had been removed and the interrogating officer used a threat of such removal during the interview. Defendant urged the proposed testimony was "crucial to support . . . defense claims" that the officer "employed . . . interrogation techniques in a manner that resulted in an admission that was both false and involuntary." The brief contradicted the prosecutor's contention "that the study of false confessions lacks methodology" and cited publications dealing with the subject.

The court then entertained further argument on the subject. The defense argued "it is unequivocally outside the ken of a juror's experience that a person could falsely confess." He noted the length of the interrogation and referred to interviews with Ben Sablan, the person who, according to defendant's statement, had denied him a job because of the crying child; Sablan instead indicated defendant had sounded like he was driving a car or was in a club "deejaying" and did not mention a crying child. The prosecutor claimed the only case holding it was error to exclude testimony of a false confession expert dealt with a defendant suffering from serious mental disabilities. He recited Dr. Leo's own writings that identified factors such as "youth, mental retardation, mental illness, vulnerable personality and temporary impairment," none of which were present here. Finally, he noted that it is the very task of the jury to assess credibility.

The court concluded, "The relevance of such expert testimony to me, based upon what I have been told by both sides, seems very minimal. The probative value would be substantially outweighed by the likelihood of confusing the jury as to their

4

duties.  [¶] I believe that such testimony, if allowed, would be substantially outweighed by the probability of prejudicial effect of such testimony because such testimony, if allowed, would say automatically he's not guilty."  The court's decision was thus based on Evidence Code section 352.

Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"We review a trial court's ruling under . . . section [352] for abuse of discretion and will reverse a trial court's exercise of discretion to admit evidence 'only if "the probative value of the [evidence] clearly is outweighed by [its] prejudicial effect." [Citation.]'"  (*People v. Valdez* (2012) 55 Cal.4th 82, 133.)  Applying this weighing test, we cannot conclude the trial court abused its discretion.

We find guidance in a recent case from the California Supreme Court which upheld a trial court's decision to exclude testimony by Dr. Leo on false confessions.  *People v. Linton* (2013) 56 Cal.4th 1146 (*Linton*) also involved a defendant's contention the trial court erred in excluding Dr. Leo's testimony regarding false and coerced confessions.  (*Id.* at p. 1181.)  *Linton* held the trial court properly excluded the testimony under Evidence Code section 352 and stated:  "As was his right, defendant did not testify and thus did not deny the truth of his interview statements. There was no other evidence offered that logically called into question the veracity of his admissions.  The only evidence that defendant pointed to as showing he made *any* false statements during his police station interview was the testimony of the two pathologists that [the victim] was not likely strangled from the front in the manner described by defendant."  (*Id*. at pp. 1181-1182.)

5

So here, defendant did not testify and thus did not deny the truth of his statements. And the only evidence offered by the physicians concerning possible birth injuries having caused the skull fractures, would not contradict a finding that defendant, in fact, struck the baby as described during his confession.

Further, the factual analysis in *Linton* is almost equally applicable here: "The ruling excluding the testimony of Dr. Leo under Evidence Code section 352 did not result in the blanket exclusion of evidence concerning the circumstances of defendant's admissions and confession, which would have been necessary in order for defendant to claim undue influence. The jury listened to tape recordings of defendant's interviews at the police station, heard the testimony of [the detectives and others] regarding the circumstances of those interviews, and heard the expert testimony of Dr. Whiting regarding defendant's particular personality traits that may have lowered his ability to withstand the pressures of interrogation and increased his suggestibility. The jury had the testimony of both pathologists regarding the manner in which [the victim] was strangled to consider against defendant's description of his actions. Defendant was able to and did strenuously argue this evidence established his admissions and confession were false, as the stress-compliant result of coercive and suggestive questioning." (*Id.* at pp. 1183-1184.) The only difference in the present case is the lack of evidence that "defendant's particular personality traits . . . may have lowered his ability to withstand the pressures of interrogation and increased his suggestibility." (*Id.* at p. 1182.) Under the circumstances, its absence supports the trial court's ruling.

*2. Impeachment of Defendant's Obstetrician-Gynecology Expert*

Defendant called Dr. Barry Schifrin, an obstetrician-gynecologist who occupied a number of teaching and clinical positions over a 40-year period. Dr. Schifrin had reviewed materials relating to the cesarean delivery of Doe. According to Dr.

6

Schifrin, there were complications. A drop in the mother's blood pressure and Doe's heart rate caused the delivery physician to change from a birth by cesarean section to an extraction, using what is described as a "kiwi flat vacuum," which, if used improperly can cause head trauma. This includes a 5 percent chance of causing skull fractures and retinal hemorrhaging. The use of a skull cap, as was done here, violates proper procedure. Dr. Schifrin opined that "the original injury stems from" the delivery activities.

Before Dr. Schifrin testified, the court conducted an Evidence Code section 402 hearing concerning his prior professional reprimand. Dr. Schifrin testified he had resigned from the American College of Obstetricians and Gynecologists in 2004, following censure by the college "for making factual misrepresentations in an opinion letter and deposition testimony for [a] medical liability claim" in 2001 or 2002. He denied the censure was appropriate, but acknowledged it indicated he "knowingly and intentionally lied in these [earlier] proceedings." After hearing argument and reviewing the parties' brief on this issue, the court ruled that, because the matter related to the witness's credibility, it would be admitted.

Because of this ruling, which defendant argues was erroneous, defense counsel questioned Dr. Schifrin about the censure. We agree the trial court correctly held the evidence admissible as proper impeachment. Although not dispositive here, we note the Missouri Court of Appeals reached the same conclusion, holding Dr. Schifrin's censure was properly used to impeach him in *Miller v. SSM Health Care Corp.* (2006) 193 S.W.3d 416, 421-424, a medical malpractice case.

In the trial court, defendant objected to the introduction of the impeachment evidence under Evidence Code section 352, arguing the issue would complicate the case and require significant time. He repeats this claim on appeal, but acknowledges *People v. Harris* (1989) 47 Cal.3d 1047, held that under California Constitution, article I, section

7

28, subdivision (d), the admission of evidence of an informant's "past reliability as [such], and the prosecutor's reference to it in closing argument, . . . involved neither error nor misconduct." The only limitation on evidence of such conduct would be under Evidence Code section 352. (*People v. Harris, supra,* 47 Cal.3d at p. 10832, disapproved on another ground in *People v. Wheeler* (1992) 4 Cal.4th 284, 299, fn. 10.)

As noted, the trial court's ruling is reviewed for abuse of discretion. (*People v. Valdez, supra,* 55 Cal.4th at p. 133.) No doubt the impeachment showing Dr. Schifrin was censured by his professional organization for having knowingly given false testimony in an earlier case was prejudicial. All impeachment of a witness is prejudicial to the party offering the witness's testimony; that's why it's impeaching. But here, where it was important for the jury to determine Dr. Schifrin's credibility, the evidence had high probative value. Thus, we cannot conclude the court abused its discretion in allowing the evidence.

Defendant argues "it cannot be said that the improperly admitted evidence that [Dr.] Schifrin was censured for 'false testimony' did not affect the jury's decision." We take no issue with this statement. But this misstates the test under Evidence Code section 352. The test is not whether the evidence may adversely affect the party offering it. Rather, Evidence Code section 352 involves a weighing process. What is the probative value of the evidence? What is the prejudice? And it is only when the probative value is clearly outweighed by the prejudice that admission is an abuse of discretion. Here, Dr. Schifrin's credibility was a relevant consideration for the jury. The evidence was probative of his credibility. This probative value was not so clearly outweighed by the prejudice that we can conclude the court abused its discretion.

8

### 3. *The Claim of Cumulative Error*

Because we conclude that neither of the two grounds urged by defendant demonstrated error by the trial court, defendant's claim that the two grounds together constitute cumulative error must necessarily fail.

## DISPOSITION

The judgment is affirmed.

RYLAARSDAM, J.

WE CONCUR:

O'LEARY, P. J.

THOMPSON, J.

9